USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 2/20/2015

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

BESAIDA SANCHEZ,

                      Plaintiff,

        -v-

CAROLYN W. COLVIN,

                      Defendant.

------------------------------------------------------------X

13 Civ. 6303 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

Plaintiff Besaida Sanchez ("Sanchez") brings this action pursuant to § 205(g) of the Social Security Act ("SSA"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner"). The decision denied Sanchez's application for supplemental security income ("SSI") on the grounds that her impairments, while severe, did not preclude her from finding other employment in the national economy. Both sides have moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).

In a December 5, 2014 Report and Recommendation, the Honorable Henry Pitman, United States Magistrate Judge, recommended that the Court (1) grant Sanchez's motion to the extent that she sought to remand this matter to the Commissioner for further proceedings pursuant to sentence four of § 405(g), and (2) deny the Commissioner's motion. Dkt. 31 (the "Report"). For the reasons that follow, the Court adopts the Report in full.

**I.     Background**[1]

Sanchez, born in 1962, attended high school through the 11th grade. Between January 2007 and July 2010, she was employed as a child-care worker. Her responsibilities included walking her charges to and from school and the park; bathing, dressing, and feeding them; and assisting them with homework. She stopped working in mid-2010 because, she states, of pain in her back, neck, legs, and arms.

On June 27, 2012, at age 50, Sanchez filed an application for SSI, claiming that she had been disabled since July 1, 2010. She alleged that she was disabled due to a number of physical and psychological ailments. These included bipolar disorder, degenerative disc disease, and degenerative joint disease. Sanchez takes several prescribed medications, including pain-killers, anti-anxiety medicine, and attention-aiding medicine. *See generally* Dkt. 11-3, 11-4.

The Social Security Administration denied her application, finding that she was not disabled. Sanchez timely requested and was granted a hearing before an Administrative Law Judge ("ALJ"), which occurred on February 25, 2013. Sanchez was represented by counsel, and testified, at the hearing.

On March 28, 2013, the ALJ issued his decision, concluding that Sanchez was not disabled within the meaning of the SSA. In making his determination, the ALJ applied the well-established five-step sequential test for determining whether an individual is disabled:

> The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed. If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits her capacity to work. If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment that is

---

[1] The Court's summary of the facts of this case is drawn from the Report's detailed account of the facts, to which neither party objects. Where indicated, the Court has also drawn facts from the administrative record. Dkt. 11 ("A.R.").

2

> listed in Appendix 1 of the regulations.  When the claimant has such an impairment, the [Commissioner] will find the claimant disabled.  However, if the claimant does not have a listed impairment, the [Commissioner] must determine, under the fourth step, whether the claimant possesses the residual functional capacity to perform her past relevant work.  Finally, if the claimant is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work.

*Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996) (citing 20 C.F.R. §§ 404.1520, 416.920).  The claimant has the burden of proof at the first four steps; if the analysis reaches the final step, though, the Commissioner has the burden at that point.  *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999).

At the first step, the ALJ found that Sanchez had not engaged in substantial gainful activity since June 27, 2012, the date she applied for benefits.  At the second step, the ALJ found that she had several severe impairments: bipolar disorder, degenerative disc disease, degenerative joint disease, right knee swelling, and right lateral epicondylitis.[2]  At the third step, the ALJ concluded that none of these impairments met, or medically equaled, those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  At the fourth step, the ALJ found that Sanchez had the residual functioning capacity to perform "less than a full range of light work" due to multiple physical limitations and because she was limited, *inter alia*, to performing "only simple and repetitive tasks."  The ALJ further found that Sanchez could not perform "any past relevant work."  At the final step, however, the ALJ concluded, in reliance on the testimony of a vocational expert, that there were certain jobs in the national economy that Sanchez could perform, such as a packaging line worker, car wash attendant, or cafeteria attendant.

---

[2] An epicondyle is a rounded protrusion at the end of a bone, and it serves as a place of attachment for ligaments, tendons, and muscles.  *See* Merriam-Webster Dictionary Online, *available at* http://www.merriam-webster.com/medical/epicondyle (last visited February 20, 2015).  Epicondylitis, which is commonly known as "tennis elbow," refers to an inflammation of an epicondyle.  *See id.*, *available at* http://www.merriam-webster.com/medical/epicondylitis.

3

On May 3, 2013, Sanchez requested review of the ALJ's decision by the Appeals Council. On July 11, 2013, the Appeals Council denied her request. The ALJ's decision thus became the final decision of the Commissioner.

On September 9, 2013, Sanchez filed a Complaint in this Court, seeking review of the Commissioner's decision. Dkt. 1. On September 30, 2013, the Court referred the case to Judge Pitman for a Report and Recommendation. Dkt. 3. On March 20, 2014, the Commissioner answered. Dkt. 12. On June 18, 2014, Sanchez moved for judgment on the pleadings and submitted an accompanying brief. Dkt. 21–22. On September 24, 2014, the Commissioner filed a cross-motion for judgment on the pleadings and an accompanying brief. Dkt. 28–29.

On December 5, 2014, Judge Pitman issued the Report, recommending that this Court (1) grant Sanchez's motion to the extent of remanding this matter to the Commissioner for further proceedings pursuant to sentence four of § 405(g), and (2) deny the Commissioner's motion. Report, 2.

The Report reasoned that remand is warranted because "[t]here is no opinion evidence in the administrative record regarding plaintiff's disability from any of her treating physicians, either medical or psychiatric. There are only sparse treatment notes from these doctors." *Id.* at 31. The Report noted that the treating physician's opinion is generally accorded controlling weight; it found "particularly problematic" the "absence of any opinion from a treating physician concerning plaintiff's ability to work." *Id.* at 31–32. The Report also noted that Sanchez's "treatment notes are vague and do not conclusively establish her disability status." *Id.* at 32. As the Report explained, rather than obtaining and considering treating physicians' opinions, the ALJ had looked at the other evidence in the record, consisting of "the one-time examinations of

4

consulting physicians, X-ray and MRI reports[,] and plaintiff's description of her symptoms and activities of daily living." *Id.* at 32–33.

The Report therefore recommended remand to permit the ALJ to "obtain an opinion from plaintiff's treating physician and plaintiff's treating psychiatrist as to plaintiff's specific exertional and nonexertional limitations." *Id.* at 33. The Report considered and rejected several other arguments Sanchez had made,[3] *see id.* at 34–36, but, it concluded, given the recommendation to remand for further development of the record, there was no need to "address whether the ALJ's opinion was supported by substantial evidence." *Id.* at 36.

The Commissioner timely filed objections on December 22, 2014. *See* Dkt. 32 ("Comm'r Objs."). Sanchez replied on January 5, 2015. *See* Dkt. 33 ("Sanchez Rep.").

## II. Discussion

### A. Legal Standards for Review of the Report

In reviewing a Report and Recommendation, a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). When specific objections are made, "[t]he district judge must determine *de novo* any part of the magistrate judge's disposition that has been properly objected to." Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636(b)(1); *United States v. Male Juvenile*, 121 F.3d 34, 38 (2d Cir. 1997). However, when the objections simply reiterate previous arguments or make only conclusory statements, the Court should review the report for clear error. *See Genao v. United*

---

[3] Specifically, the Report rejected Sanchez's arguments that the ALJ (1) failed to appropriately "develop the record because he failed to obtain the report of the MRI of plaintiff's knee," and (2) "failed to re-contact the consulting examiners and failed to order them to conduct another exam." Report, 34–36.

5

*States*, No. 08 Civ. 9313 (RO), 2011 WL 924202, at *1 (S.D.N.Y. Mar. 16, 2011); *Kirk v. Burge*, 646 F. Supp. 2d 534, 538 (S.D.N.Y. 2009) (collecting cases).

    **B.**    **The Commissioner's Objections to the Report**

In asking that the ALJ's decision be sustained and resisting the Report's recommendation of a remand, the Commissioner argues that (1) it is not *per se* error for the ALJ to render a decision without obtaining the treating physician's opinion; (2) whether the evidence was inadequate to allow the ALJ to determine whether Sanchez is disabled turns on "a consideration of the available evidence"; and (3) the Report erred by "explicitly declining to consider whether there was substantial evidence in the record to support the [] ALJ's [] findings." Comm'r Objs., 1–2. The Commissioner argues that Sanchez's medical history before the ALJ was "complete." *Id.* at 3. And, procedurally, the Commissioner notes, Sanchez was represented by counsel at the hearing and never sought the ALJ's assistance in obtaining medical source statements from the treating physician. *Id.* The Commissioner thus asks the Court to reject the Report and to find that substantial evidence supported the ALJ's findings. *Id.* at 4.

Because the Commissioner has raised a specific objection to the Report, the Court reviews the ALJ's decision *de novo*.

    **C.**    **Review of the ALJ's Decision**

        **1.**    **General Legal Standards under the SSA**

"A claimant is disabled and entitled to disability insurance benefits if she is unable 'to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013) (quoting 42 U.S.C. § 423(d)(1)(A)). The SSA regulations set out

the five-step sequential evaluation process, reviewed above, to guide disability determinations. As to Sanchez, the ALJ found that Sanchez is not currently engaged in substantial gainful activity; that she does have severe impairments; that she is not automatically disabled because her impairments are not listed in Appendix 1 of the Social Security regulations; that she cannot perform her past work given her "residual functioning capacity" ("RFC"); but that she can do other work in the national economy, given her RFC, age, education, and work experience. *See* 20 C.F.R. § 404.1520.

A district court may "set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (quoting 42 U.S.C. § 405(g)); *see also Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (reviewing courts "conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied") (citations omitted). "It is not the function of a reviewing court to decide *de novo* whether a claimant was disabled . . . or to answer in the first instance the inquiries posed by the five-step analysis set out in the SSA regulations." *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (citation omitted).

Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Shaw*, 221 F.3d at 131 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The Second Circuit has described substantial evidence review as "a very deferential standard of review—even more so than the 'clearly erroneous' standard." *Brault*, 683 F.3d at 448. Accordingly, once an ALJ finds facts, this Court may only reject those findings "if

7

a reasonable factfinder would *have to conclude otherwise*." *Id.* (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)) (emphasis in *Brault*).

## 2. Specific Standards: The RFC, Treating Physicians, and *Tankisi*

The ALJ's critical determination in this case concerned Sanchez's residual functioning capacity. As the Second Circuit has recently explained:

> The RFC is an assessment of "the most [the disability claimant] can still do despite [his or her] limitations." 20 C.F.R. § 404.1545(a)(1). Although the RFC is assessed using "all the relevant evidence in [the] case record," *id.*, *the medical opinion of a treating physician is given "controlling weight" as long as it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is not inconsistent with other substantial evidence in the record.* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Even if the treating physician's opinion is contradicted by other substantial evidence, and so is not controlling, it may still be entitled to significant weight "because the treating source is inherently more familiar with a claimant's medical condition than are other sources." *Schisler v. Bowen*, 851 F.2d 43, 47 (2d Cir. 1988).

*Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33 (2d Cir. 2013) (summary order) (emphasis added).

The case law, and the SSA's regulations, both reflect the heavy weight generally given to treating physicians' opinions. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also, e.g.*, *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004); *Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993). For this reason, an ALJ who rejects the treating physician's opinion must articulate "good reasons" for doing so. 20 C.F.R. § 404.1527(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.").[4]

---

[4] As a recent court in this Circuit summarized:

> When an ALJ refuses to assign a treating physician's opinion controlling weight, she must consider a number of factors to determine the appropriate weight to assign, including (1) the frequency of the physician's examination of the claimant, and the length, nature and extent of the treatment relationship; (2) the evidence in support of the treating physician's opinion; (3) the consistency of the opinion with

8

Under SSA regulations, a "treating physician" includes "physicians," "psychologists," and "other acceptable medical sources." 20 C.F.R. § 404.1527.

Nevertheless, the Second Circuit has held that it is not *per se* error for an ALJ to make a disability determination without having sought the opinion of the claimant's treating physician. *See, e.g.*, *Tankisi*, 521 F. App'x at 33–34; *Pellam v. Astrue*, 508 F. App'x 87, 90 (2d Cir. 2013) (summary order). In *Pellam*, for example, the court sustained an ALJ's determination; it explained that, under the circumstances there—"especially considering that the ALJ also had all of the treatment notes from Pellam's treating physicians—we do not think that the ALJ had any further obligation to supplement the record by acquiring a medical source statement from one of the treating physicians." 508 F. App'x at 90.

As the Second Circuit noted in *Tankisi*, the SSA's regulations as to the need for seeking a treating physician's opinion contain directives that may be seen as competing. On the one hand, they provide that the Social Security Administration "will request a medical source statement about what you can still do despite your impairment(s)." 521 F. App'x at 33 (quoting 20 C.F.R. §§ 404.1513(b)(6), 416.913(b)(6)). As the Second Circuit noted, this "plain text . . . does not appear to be conditional or hortatory: it states that the Commissioner '*will* request a medical source statement' containing an opinion regarding the claimant's residual capacity. The regulation thus seems to impose on the ALJ a duty to solicit such medical opinions." *Id.*

---

the record as a whole; (4) whether the opinion is from a specialist; and (5) other factors brought to the ALJ's attention that tend to support or contradict the opinion. *See* 20 C.F.R. § 404.1527(c). "Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) (citation omitted); *see also Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).

*Rymer v. Colvin*, No. 12 Civ. 0644 (MAT), 2014 WL 5339690, at *6 (W.D.N.Y. Oct. 20, 2014).

(quoting 20 C.F.R. §§ 404.1513(b)(6), 416.913(b)(6)) (emphasis in original).  On the other hand, as the Second Circuit noted, the regulation states that "the lack of the medical source statement will not make the report incomplete." *Id.* (quoting 20 C.F.R. §§ 404.1513(b)(6), 416.913(b)(6)).  Further, as the Circuit observed, the regulation provides that "'[m]edical reports *should* include . . . [a] statement about what you can still do despite your impairment,' not that they *must* include such statements." *Id.* (quoting 20 C.F.R. §§ 404.1513(b)(6), 416.913(b)(6)) (emphasis in original).

Synthesizing these directives, the Second Circuit set out the following approach to the need for a treating physician's analysis—one that focuses on circumstances of the particular case, the comprehensiveness of the administrative record, and, at core, whether an ALJ could reach an informed decision based on the record:

> These provisions indicate that the ALJ's conclusions would not be defective if he requested opinions from medical sources and the medical sources refused.  Taken more broadly, they suggest *remand is not always required when an ALJ fails in his duty to request opinions*, particularly where, as here, the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity.  *See Moser v. Barnhart*, 89 F. App'x 347, 348 (3d Cir. 2004); *Scherschel v. Barnhart*, 72 F. App'x 628, 630 (9th Cir. 2003); *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995).
>
> The medical record in this case is quite extensive.  Indeed, although it does not contain formal opinions on Tankisi's RFC from her treating physicians, it does include an assessment of Tankisi's limitations from a treating physician, Dr. Gerwig.  Given the specific facts of this case, including a voluminous medical record assembled by the claimant's counsel that was adequate to permit an informed finding by the ALJ, we hold that it would be inappropriate to remand solely on the ground that the ALJ failed to request medical opinions in assessing residual functional capacity.  *Cf. Lowry v. Astrue*, 474 F. App'x 801, 804 (2d Cir. 2012) (summary order); *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999).

*Tankisi*, 521 F. App'x at 33–34 (emphasis added).

### 3. Application of Legal Standards

In light of the SSA's regulations as distilled by the Second Circuit in *Tankisi*, the central question here is whether, "[g]iven the specific facts of this case," the administrative record before the ALJ as to Sanchez, although lacking the opinion of her treating physician, was sufficiently comprehensive "to permit an informed finding by the ALJ." 521 F. App'x at 33–34. After careful, *de novo* review, the Court joins Judge Pitman in holding that it was not.

Significantly, the administrative record here is a far cry from that in *Tankisi* and similar cases, which have excused the ALJ's failure to seek a treating physician's opinion based on the completeness and comprehensiveness of the record. *See, e.g.*, *Perez*, 77 F.3d at 48 ("The ALJ already had obtained and considered reports from Dr. El–Dakkak, Dr. Sanchez, and Dr. Celestin [who were each previous or current treating physicians of the claimant]. The ALJ had before him a complete medical history, and the evidence received from the treating physicians was adequate for him to make a determination as to disability."); *Rosa*, 168 F.3d at 79 n.5 ("[W]here there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information . . . .") (quoting *Perez*, 77 F.3d at 48). Unlike in *Tankisi*, the medical records before the ALJ were not "voluminous," and do not "include an assessment of [Sanchez's] limitations from a treating physician." *Tankisi*, 521 F. App'x at 33–34; *see also Perez*, 77 F.3d at 48. Furthermore, the consulting physicians who examined Sanchez did so just once (both on the same day), whereas the consulting physician in *Tankisi* examined Tankisi twice. *See Tankisi*, 521 F. App'x at 34.

More fundamentally, the consulting psychologist's statements as to Sanchez are far from conclusive. They are, instead, couched in hesitant, vague, and at points equivocal terms. For instance, the consulting psychologist concluded that "[t]he results of the examination *appear to*

11

*be consistent with* psychiatric problems and this *may* significantly interfere with the claimant's ability to function on a daily basis." Dkt. 11-2, at 117 (A.R. 300) (emphasis added).  In the same report, in completing an "ability to manage funds" assessment, the consulting psychologist wrote that Sanchez "*may* need *some* assistance." *Id.* (emphasis added).  The psychologist did not elaborate nor explain.  The consulting psychologist similarly wrote that Sanchez "is able to maintain attention and concentration for *periods* of time," but declined to expound upon the point (*e.g.*, by identifying even an approximate length of time).  *Id.* at 116 (A.R. 299). Furthermore, the consulting psychologist reported that Sanchez "*may* have difficulty maintaining a regular schedule and learning new tasks," and that "[s]he *may* not always make appropriate decisions, relate adequately with others, or appropriately deal with stress." *Id.* at 116–17 (A.R. 299–300) (emphasis added).  Needless to say, an individual's ability to maintain a regular schedule and to generally make "appropriate decisions" may bear significantly on her capacity to work.  Yet the consulting psychologist supplied the ALJ with no further details, analysis, or explanation on which to assess this capability.  In sum, in nearly every important sentence of her brief report, the consulting psychologist used hedge words.  The resulting report may effectively be summarized as follows: "Sanchez very well might have psychological impairments, which might affect her ability to function on a daily basis, potentially in several ways."

To be sure, in some cases, this degree of uncertainty may be the most that an ALJ can realistically expect from a single visit to a consulting physician of a patient who may have multiple mental-health disorders.  But that underscores why, in such cases, the perspective of the treating physician, particularly one of longer standing, is generally accorded greater weight. *See, e.g.*, *Tankisi*, 521 F. App'x at 34 ("[T]he opinions of consulting physicians . . . generally have less value than the opinions of treating physicians. . . .  [T]he general rule is driven by the

12

observation that consultative exams are often brief, are generally performed without the benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day.") (citation and internal quotation marks omitted).  That is one of the reasons that ALJs have the duty to seek treating physicians' and psychiatrists' opinions.  *See, e.g.*, *id.* at 33.  And here, Sanchez's particular conditions—bipolar disorder, with notations as to schizophrenia as well, *see, e.g.*, Dkt. 11, at 49 (A.R. 45); Dkt. 11-2, at 29 (A.R. 213); *id.* at 108 (A.R. 291)—are long-term disorders whose gravity and impact vary by individual.  A treating psychiatrist's insights, which may capture what a one-time visit to a consulting psychologist cannot, would be obviously valuable.  And *Tankisi*, and the cases on which it relies, direct ALJs and courts to take into account such case-specific considerations—in effect, whether the administrative record, where lacking the opinions of the treating physician, is robust enough to enable a meaningful assessment of the particular conditions on which the petitioner claims disability.  *See, e.g.*, *Tankisi*, 521 F. App'x at 33–34; *Pellam*, 508 F. App'x at 90.

      The consulting psychologist's lack of certitude as to the potential impact on Sanchez of her various conditions, although understandable given the psychologist's limited contact with Sanchez, was highly significant here.  It should have been recognized as such by the ALJ as a reason to demand the assessment of her treating psychiatrist.  Sanchez's asserted psychological impairments are of central importance to her claim for disability; but, at the crucial stage at which her RFC—and the impact of her psychological impairments—was determined, the ALJ had quite little data on which to rely.  Under these circumstances, it was, as Judge Pitman concluded, clear error not to seek the opinion of Sanchez's treating psychiatrist—the medical professional who by dint of position had greater contact, experience, knowledge, and, likely, certitude about Sanchez's complex conditions and their possible effects on her.  Given the

13

hesitancy of (and the slender factual basis for) the consulting psychologist's opinions, the failure to obtain the treating psychiatrist's opinion was a gaping hole in this record.[5]

Unlike in *Tankisi*, the balance of the record, which the Court has closely examined, does not cure this central flaw. It contains a fair amount of entries as to certain physical ailments, but extremely vague notes for psychological ones. The treating psychiatrists' notes repeatedly list "bipolar disorder, nos" as an "active issue[]" or as a condition on the "problem list." *See, e.g.*, Dkt. 11-3, at 12, 16 (A.R. 313, 317); Dkt. 11-4, at 2; 5–6, 8, 10, 13 (A.R. 408, 411–12, 414, 416, 419). But their notes that actually discuss Sanchez's bipolar disorder are quite cursory. They are notable for their lack of detail. The following entries illustrate the broader point:

> **TODAY'S ASSESSMENT:**
> **Active Issues:**
>   1. **BIPOLAR DISORDER, NOS**: (296.80)
>      **Orders: Consult (OPD), Psychiatry - Adult**

Dkt. 11-4, at 37 (A.R. 443); *see also* Dkt. 11-4, at 10, 26 (A.R. 416, 432).

> **TODAY'S ASSESSMENT:**
> **Active Issues:**
>
>   1. [Description of physical symptoms]
>
>   2. **BIPOLAR DISORDER, NOS**: (296.80)
>      doing well considering that her mother is dying
>      continue [medication] 200 mg
>      [medication] 20 mg
>      [medication] 2 mg tid
>      [medication] 10 mg

Dkt. 11-2, at 55 (A.R. 238).

---

[5] In this case, in fact, there were actually two possible treating psychiatrists from whom the ALJ could have sought such a report: Dr. Juan Dizon, who treated Sanchez between August 2010 and June 2012, and Dr. Kingsley Nwokeji, who treated Sanchez between September 2012 and January 2013.

> **TODAY'S ASSESSMENT:**
> **Active Issues:**
>
> 1. [Description of physical symptoms]
>
> 2. **BIPOLAR DISORDER, NOS**: (296.80) 09-Jan-2009 15:18
>    no racing thoughts
>    still with mood swings
>    difficult to focus
>    continue [medication] 20 mg, [medication] 20 mg and [medication] 10 mg tid
>
> [Description of more physical symptoms]

Dkt. 11-3, at 54 (A.R. 355).

> **TODAY'S ASSESSMENT:**
> **Active Issues:**
>
> 1. [Description of physical symptoms]
>
> 2. **BIPOLAR DISORDER, NOS**: (296.80)
>    fair control
>    continue [medication] 200 mg, [medication] 20 mg, and [medication] 2 mg tid

Dkt. 11-3, at 75 (A.R. 376).

Other entries are similar. They tend to include a very short and often vague update (*e.g.*, "controlled," or "continue treatment as per psychiatry," Dkt. 11-3, at 13 (A.R. 314); Dkt. 11-4, at 16, 21 (A.R. 422, 427)), followed by a short note about medication (*e.g.*, "continue current meds" or, alternatively, a list of medication names and quantities, Dkt. 11-3, at 13 (A.R. 314); Dkt. 11-2, at 55 (A.R. 238)), and sometimes a short note as to side effects of the some of the listed medications (*e.g.*, drowsiness, effect on appetite, *see* Dkt. 11-3, at 48, 66 (A.R. 349, 367)). Some brief phrases in the treatment notes may be taken, in isolation, to suggest functionality, whereas others can be read to support Sanchez's claim of disability. *Compare* Dkt. 11-2, at 58 (A.R. 241) ("doing well"); Dkt. 11-3, at 78 (A.R. 379) (same); Dkt. 11-3, at 27 (A.R. 328) ("clear thinking except when under a lot of stress"), *with* Dkt. 11-3, at 54 (A.R. 355) ("still with

15

mood swings[;] difficult to focus"); Dkt. 11-4, at 9 (A.R. 415) ("mood is anxious, affect is mood congruent"). And, on multiple days, there are not even brief phrases characterizing Sanchez's state or functionality; instead, there is simply the notation that she should "continue treatment as per psychiatry," *see, e.g.*, Dkt. 11-4, at 16, 21 (A.R. 422, 427), or the rather mysterious entry, "MOOD DISORDER[:] APPRECIATE PSYCH NOTE," *see, e.g.*, Dkt. 11-4, at 33, 42, 46 (A.R. 439, 448, 452).

The critical point is that *all* of these records lack the sorts of nuanced descriptions and assessments that would permit an outside reviewer to thoughtfully consider the extent and nature of Sanchez's mental-health conditions and their impact on her RFC. The ALJ and reviewing courts should not have to be in the position of attempting to decode vague notations.

Such elliptical notes do not come close to compensating for the lack of a treating psychiatrist's opinion. Simply put, they do not meaningfully convey *how* the condition in question affects the particular patient; the cursory words used would apply to a wide range of people diagnosed with the condition but afford extremely little basis for individualized assessment. And under the SSA's regulations, such an assessment is the crucial issue for determining a disability claimant's RFC, and is central reason for the general preference given to treating physicians' opinions. *See* 20 C.F.R. § 404.1527(a)(2) ("Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about *the nature and severity of your impairment(s)*, including your symptoms, diagnosis and prognosis, *what you can still do despite impairment(s)*, and your physical or mental restrictions.") (emphasis added). In other words, the record in this case illustrates precisely why the holistic perspective of a treating psychiatrist is often crucial, and would have been especially valuable here.

16

In sum, the administrative record in this case was quite clearly not "sufficient" to render a considered judgment as to Sanchez's RFC. *Tankisi*, 521 F. App'x at 33–34. This error, in turn, called into question the next step of the ALJ's analysis, in which the ALJ assessed, based on the claimant's perceived RFC, whether there were jobs in the national economy that she could perform. *See* Dkt. 11, at 35 (A.R. 31) ("To determine the extent to which these limitations erode the unskilled light occupational base, I asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functioning capacity. The vocational expert testified that given all of these factors the individual would be able to perform" certain jobs including a packaging line worker, car wash attendant, and cafeteria attendant).

For these reasons, having carefully reviewed the administrative record and applied to it the standards articulated in *Tankisi* and its forebears, the Court reaches the same conclusion that Judge Pitman did in his thoughtful Report: It was legal error for the ALJ not to obtain opinions from plaintiff's treating physician, and especially her treating psychiatrist, regarding Sanchez's specific conditions and limitations. *See Shaw*, 221 F.3d at 131 (district court may "set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error") (quoting 42 U.S.C. § 405(g)).

## CONCLUSION

For the reasons set out in the Report and in this Opinion, the Court denies the Commissioner's motion for judgment on the pleadings, and grants Sanchez's motion to the extent it seeks to remand the case to the Commissioner for further development of the record.

17

The Clerk of Court is directed to terminate the motions pending at docket numbers 21 and 28, and to close this case.

SO ORDERED.

*Paul A. Engelmayer*
PAUL A. ENGELMAYER
United States District Judge

Dated: February 20, 2015
     New York, New York